UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| CRYSTAL G. COOK ) | |
| ) | |
| v. ) | NO. 2:04-CV-354 |
| ) | |
| JO ANNE B. BARNHARDT, ) | |
| Commissioner of Social Security ) | |

**MEMORANDUM OPINION**

The plaintiff Crystal G. Cook has filed a motion for a judgment on the pleadings on her complaint to obtain judicial review of the final decision of the defendant Commissioner of Social Security Jo Anne B. Barnhardt to deny her application for supplement security income under the Social Security Act. The defendant has filed a motion for summary judgment.

Ms. Cook was born in 1975 and was 29 years old at the time of her last administrative hearing. She completed tenth grade and has no relevant past work experience. [Tr. 36]. Ms. Cook alleges she is disabled as of May 1, 1997, from manic depression, obsessive compulsive disorder, and nervousness. [Tr. 172]. In January 2003, an Administrative Law Judge [ALJ] found that Ms. Cook was not disabled. [Tr. 32-41]. However, in July 2003, the Appeals Council remanded the case

for further development. [Tr. 154-56]. Based upon a lack of medical evidence that Ms. Cook had a mental or physical impairment which has lasted for more than 12 continuous months, the ALJ found following the remand that Ms. Cook was not disabled as defined by the Social Security Act. [Tr. 20].

In 1999, Ms. Cook sought treatment for depression and obsessive compulsive disorder [OCD].[1] [Tr. 244]. She told her examiner that she had constant thoughts she could not get out of her head of harming her baby and her child. [Tr. 244]. In March 2001, it was noted that her depression was controlled at the present time. [Tr. 237]. By August 2001, however, Ms. Cook described herself as not functioning in reality and having frequent and repetitive thoughts of harming herself and her family. [Tr. 234].

In July 2001, Ms. Cook admitted herself to Woodridge Psychiatric Hospital. [Tr. 253-61]. She "reported having had intrusive, recurring thoughts and images of killing her children, stabbing with a knife, pushing or otherwise attempting to hurt them." [Tr. 253]. After a seven-day stay in which many different medications were tried, Ms. Cook asked to be released for out-patient therapy because "she was no longer threatened by the minimal obsessions she was having." [*Id.*].

---

[1] Because Ms. Cook only challenges the findings concerning her mental impairments, medical evidence related to her physical impairments will not be detailed.

In August 2001, Ms. Cook was evaluated by Cherokee Health Systems [Cherokee]. [Tr. 272-75]. The psychiatrist believed she had OCD, panic disorder with agoraphobia, and a major depressive disorder. [Tr. 272]. There was also some concern Ms. Cook might be bipolar. [*Id.*]. Ms. Cook was told to continue her medications. [*Id.*]. By September 2001, Ms. Cook claimed that life was "going relatively well for her" and her compulsive behaviors were under "relatively good control." [Tr. 271]. One of her medications was increased. [*Id.*]. In October 2001, Ms. Cook reported discontinuing one of her medications because of its side effects. [Tr. 270]. In mid October 2001, Ms. Cook returned to the clinic with complaints of continued obsessive homicidal and suicidal ideation. [Tr. 269]. Her medication was increased. [*Id.*].

In December 2001, Ms. Cook was evaluated by Alice Garland, M.S., in connection with her application for disability benefits. [Tr. 277-80]. Ms. Garland concluded Ms. Cook was most likely limited in her ability to perform complex and detailed work, and her ability to relate to others, work with the public, and adapt were also limited by her emotional liability. [Tr. 280].

In January 2002, Bill Regan, Ph.D., evaluated Ms. Cook in connection with her application for disability benefits. [Tr. 281-97]. Dr. Regan found that Ms. Cook has mild restriction in activities of daily living and maintaining social functioning,

3

moderate difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation. [Tr. 291]. Specifically, Ms. Cook was markedly limited in her ability to understand, remember, and carry out detailed instructions and interact appropriately with the general public. [Tr. 295-96].

In September 2001, John Porter, M.S., evaluated Ms. Cook in connection with her application for disability benefits. [Tr. 343-49]. Mr. Porter indicated Ms. Cook tested in the mentally deficient range. [Tr. 345]. An IQ test indicated Ms. Cook's full-scale IQ was 59, which Mr. Porter stated was an "accurate reflection of her true ability at this time." [Tr. 347]. Ms. Cook's score on the Miller Forensic Assessment Test indicated malingering or exaggerating, although Mr. Porter cautioned that "because of her impaired intellectual abilities, [Ms. Cook] may have had some significant problems in understanding or comprehending the questions." [Tr. 348]. In conclusion, Mr. Porter found that Ms. Cook's ability to understand and remember was limited at that time because of her impaired intellectual ability, her ability to sustain concentration and persistence was limited at that time because of her depression, anxiety, panic disorder, and OCD, her ability to socially interact was limited at that time because of a personality disorder not otherwise specified, and her ability to adapt was markedly limited at that time because of her major depressive disorder, generalized anxiety disorder, panic disorder, OCD, probable malingering, personality

4

disorder, and impaired intellectual ability. [Tr. 349].

Also in September 2002, Ms. Cook reported to Cherokee some improvement in her symptoms. [Tr. 364]. In fact, she indicated she felt like she was "doing quite well" and denied her psychiatrist's offer to increase her medication. [*Id*.].

At Ms. Cook's first administrative hearing held on December 10, 2002, the testimony of Ms. Cook, her husband, Dr. Thomas Schacht, and Ms. Judy Pierson was received into evidence. [Tr. 51-79]. Dr. Schacht testified Ms. Cook had obsessive compulsive disorder and had obsessive and compulsive thoughts about hurting her children. [Tr. 57].

Ms. Cook testified she was never left alone because of her "thoughts." [Tr. 60, 61]. She considered her main problem to be that her mind "just kind of takes over its own little world." [Tr. 61]. When that happens, Ms. Cook is unable to concentrate, and it is difficult for her to accomplish any task. [*Id*.]. She experiences side effects from the medication she takes to control her problems. [Tr. 62]. Some of the side effects include dizziness, blurred vision, headaches, back aches, and cramping in her legs. [*Id*.]. Ms. Cook was hospitalized in a psychiatric facility once and sees a mental health counselor every two weeks. [Tr. 62, 63]. She testified she has depression, anxiety attacks, and delusions. [Tr. 64-65]. Ms. Cook described her delusions as "horrible," and they included her seeing herself hurting herself or her

5

children by stabbing them. [Tr. 66].

Mr. Kevin Cook, Ms. Cook's husband, testified next that his wife does not focus or concentrate well, cries a lot, and gets depressed. [Tr. 73-74].

Ms. Judy Pierson, the mother of Ms. Cook, testified last. [Tr. 75-78]. She said that her daughter is "just not there" and is "in another world." [Tr. 77].

In August 2003, Ms. Cook reported to Cherokee a recurrence of obsessive thoughts, some suicidal ideation, an increase in her OCD behavior, mood swings, and depression. [Tr. 377-78].

Ms. Cook's second administrative hearing was held on November 18, 2003, and the testimony of Ms. Cook and vocational expert Cathy Sanders was received into evidence. [Tr. 84-98]. An additional administrative hearing was held because the case was remanded by the Appeals Council. [Tr. 83]. Ms. Cook testified there was no major difference in her condition since the previous hearing. [Tr. 85]. She still believed she is unable to perform any work. [Tr. 91].

Vocational expert Cathy Sanders testified next. The ALJ asked her to assume a person who is a younger individual, with a limited education, average intelligence, no physical limitations, moderate limitations in maintaining concentration, persistence, or pace, and has had one to two episodes of decompensation. [Tr. 93]. Ms. Sanders testified such a person could perform unskilled work as a cleaner,

stocker, bagger, food preparer, hand packer, machine feeder, *inter alia*. [Tr. 94]. If such a person were markedly limited in her ability to understand, remember, and sustain concentration, persistence, or pace, there would not be any jobs available. [Tr. 96].

In January 2003, Ms. Cook reported to Cherokee feeling "much better," and she denied any mood swings, depression, or irritability. [Tr. 380].

In February 2004, Ms. Cook noted to Cherokee that she had "some improvement lately in her mood," but an increase in her OCD behavior. [Tr. 424].

Ms. Cook's final administrative hearing was held on May 5, 2004, and the testimony of Dr. Schacht, vocational expert Donna Bardsley, and Ms. Cook was received into evidence. [Tr. 103-32]. Dr. Schacht testified that Ms. Cook's primary impairment–obsessive compulsive disorder with homicidal ideation–had, according to the records, improved with treatment. [Tr. 111]. The doctor believed it would be reasonable to restrict Ms. Cook from "safety-sensitive jobs that required a high degree of vigilance and alertness, based on a combination of factors including potential distraction by obsessive symptoms, and [the] possibility of sedation from her medications." [*Id.*].

Vocational expert Donna Bardsley testified next. [Tr. 117-27]. She was asked to assume a younger individual who had a limited education, an IQ of about 78 to 80,

no physical impairment, and could not work in a safety-sensitive position that required a high degree of vigilance or alertness. [Tr. 117]. Such a person also could not work with children. [Tr. 118]. She could, however, work in a low-stress position performing simple and repetitive work. [*Id.*]. According to Ms. Bardsley, such a person could work in some food service related occupations, and as a cleaner, cashier, or sales clerk, *inter alia*. [Tr. 118-19].

Ms. Cook was the last witness to testify. [Tr. 127-32]. She testified her condition had basically stayed the same since the last administrative hearing. [Tr. 127].

The ALJ ruled that Ms. Cook was not disabled because she did not have a severe impairment that would significantly limit her ability to work. [Tr. 20]. In the alternative, the ALJ stated that if Ms. Cook did have a severe impairment, she would still be able to work at simple and repetitive low stress jobs that did not require a high pace and production, although she should not work at safety sensitive jobs or around hazardous machinery and motor vehicles. [*Id.*]. The ALJ then determined there were a significant amount of such jobs in the national economy. [*Id.*].

This court must affirm an ALJ's conclusions unless the ALJ applied incorrect legal standards or made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405g. "Substantial evidence" is such relevant evidence as a

8

reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Accordingly, this court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

Ms. Cook requests a judgment on the pleadings and claims the ALJ erred by finding that she did not have a severe impairment, failing to follow the July 28, 2003, Order of Remand of the Appeals Council, and completely accepting the opinion of Dr. Schacht. In addition, Ms. Cook claims the questions asked of the vocational expert were too "amorphous."

Ms. Cook first asserts the ALJ erred by failing to find that she had a severe impairment. The ALJ concluded Ms. Cook's mental impairments were not severe for several reasons. First, he noted that since she was hospitalized in July 2001, she experienced a "significant improvement in [her] mental condition." [Tr. 20]. The ALJ specifically noted that Ms. Cook's records from August 2001 until February 2004 indicated that most of her mental status examinations were within normal limits. [Tr. 16-17]. In addition, many of her mental health providers noted improvements in her

9

conditions. [*Id.*]. Although Ms. Cook certainly had times when her mental impairments affected her more than others, the ALJ was correct in noting that the medical evidence of record did not establish a "mental impairment which has lasted for longer than 12 continuous months by objective medical evidence." [Tr. 20]. The ALJ's finding that Ms. Cook's mental impairment was not severe was based on substantial evidence.

Next, Ms. Cook claims the ALJ did not follow the July 28, 2003, Order of Remand of the Appeals Council. The remand order indicated the ALJ was supposed to evaluate the opinion evidence of record from Bill Regan, M.D., further evaluate Ms. Cook's mental impairment under 20 C.F.R. 416.920a, and, if warranted, obtain evidence from a vocational expert. [Tr. 155]. The ALJ evaluated and rejected Dr. Regan's opinion evidence of record in his decision. [Tr. 14]. And, although the ALJ did not cite specifically to 20 C.F.R. 416.920a in his decision, the ALJ did follow the protocol for evaluating a mental impairment under that regulation. [Tr. 14-20]. Finally, the ALJ did consult with a vocational expert. [Tr. 20, 117-27]. Because the ALJ followed the remand order, Ms. Cook's assertions are baseless.

Ms. Cook also asserts the ALJ erred in completely accepting the opinion of Dr. Schacht. Dr. Schacht testified at two of Ms. Cook's administrative hearings. [Tr. 57-58, 103-17]. The ALJ noted that Dr. Schacht thought Ms. Cook's mental impairments

10

might be somewhat related to her non-compliance with taking her thyroid medication, her intellectual testing was not supported by school records, that she could work in low stress jobs that were simple and repetitive without requiring a high pace and production, and that she would be able to relate well to others. [Tr. 17-18]. Significantly, the medical record is void of the opinion of any of Ms. Cook's mental health providers that contradicts the findings of Dr. Schacht, and Ms. Cook failed to provide this court with the name of any treating mental health source whose opinion would contradict that of Dr. Schacht. And, on the whole, the doctor's opinions were consistent with the medical evidence of record which indicated that Ms. Cook was generally logical, without suicidal/homicidal ideation, alert, oriented, and had a euthymic mood. The ALJ's reliance on Dr. Schacht's opinions was based on substantial evidence.

Finally, Ms. Cook contends the questions asked of the vocational expert were too "amorphous." Specifically, Ms. Cook claims the ALJ asking the vocational expert to assume a person who was limited to "low stress" jobs was defective because Ms. Cook's IQ was not mentioned. [Tr. 118]. In *Webb v. Commissioner of Social Security*, 368 F.3d. 629, 633 (6th Cir. 2004), however, the court noted that vocational expert are not supposed to interpret medical evidence. Instead, the "vocational expert's testimony is directed solely to whether, given a claimant's age, experience,

11

and education, along with the ALJ's assessment of what she 'can and cannot do,' there exist a significant number of employment opportunities for her in the regional and national economies." *Id.* Because this court finds a specific IQ number to be medical evidence and that the vocational expert should not have been given a specific IQ number, Ms. Cook's claim that the hypothetical was defective must fail.

Accordingly, Ms. Cook's motion for a judgment on the pleadings will be denied, the defendant's motion for summary judgment will be granted, and this action will be dismissed.

An appropriate order will follow.

        ENTER:

                               s/Thomas Gray Hull
                               THOMAS GRAY HULL
                                  SENIOR U. S. DISTRICT JUDGE